A97A0172. FREYER et al. v. SILVER.

(507 SE2d 7)

McMurray, Presiding Judge.

In this slip-and-fall case, plaintiff Linda Silver sought to recover for personal injuries she sustained in a parking lot owned by defendants Fred R. Freyer, Jr., Richard J. Uberto, and Domus Properties, a Georgia partnership ("the Domus defendants"), as she was approaching defendant Folks, Inc.'s restaurant in Smyrna, Georgia. According to the complaint, plaintiff fell and "seriously injure[d] her foot and ankle because of a dangerous and defective storm drain which was unsafely placed and constructed. Defendants and their employees [allegedly] knew by virtue of a similar incident which preceded the injury suffered by Plaintiff . . . that the storm drain in the parking lot created an unreasonable risk of injury to invitees. . . ." In their respective answers, defendants denied the material allegations. After discovery, the Domus defendants, as well as defendant Folks, Inc., moved for summary judgment, contending the hazard complained of "was open, obvious and should have been apparent to [plaintiff], such that her failure to exercise ordinary care for her own safety precludes recovery. . . ." Viewed in the light most favorable to plaintiff as the non-movant, the record authorizes the following recitation of facts: On May 23, 1992, plaintiff went to a Po Folks restaurant operated by defendant Folks, Inc. and located in a shopping center owned by Domus Properties. Defendants Freyer and Uberto are the general partners of Domus and had purchased the shopping center in 1991, after its construction. Prior to the purchase, defendant Freyer

retained architect Gary Coursey and the two walked the property so Coursey could evaluate it from a structural standpoint. At his deposition, defendant Freyer testified that the Domus defendants were responsible for striping the parking lot, paving the parking lot, and patching the parking lot. Under the terms of the lease with defendant Folks, Inc., it was "[p]rovided that reasonable access to the Premises and the parking facilities in the Shopping Center are not materially and adversely reduced or impaired, [the Domus defendants retained the right to] increase, or change the dimensions or location of the walkways, buildings and parking areas from time to time . . . in any manner whatsoever. . . ." But defendant Freyer "thought that the Po Folks people have kind of maintained that area [around the restaurant]."

Plaintiff Silver had been to this Po Folks before, but had eaten inside. May 23, 1992, was "a pleasant day. . . ." Near dinner time and while it was still daylight, plaintiff Silver went to Po Folks to order take out. She parked her car in one of two spots designated for "To Go" parking. The designated spot in which she parked was parallel and directly adjacent to a catch basin for draining water from the parking lot. She pulled straight into the parking place, such that the catch basin ran along the passenger side of her car with a manhole cover directly above the basin in the sidewalk. She exited from the driver's side, went in, ordered her food, and then returned to the car to wait for it, since her dog remained in the car. She did not cross the catch basin either going into the restaurant or coming out. After returning to her car, plaintiff stood by the passenger side, next to the catch basin. When she fell, plaintiff's feet were pointing toward the catch basin.

Asked what caused her to fall, plaintiff Silver testified as follows: "I must have just shifted my weight or moved my foot a little, and all of a sudden I went sliding down with both feet into this area. . . ." She "went down so fast on both feet, and . . . landed on [her] butt with both feet on the ground and in a kind of a sitting position." It was now "like early dusk." Plaintiff could not say whether the light conditions had anything to do with her fall. When queried why she fell, plaintiff answered: "Because there was a hole there. *There was an area that was slanting down that I did not see, and I couldn't see. . . .* It looked straight." (Emphasis supplied.) When asked if anything prevented her from seeing the area that slanted down, plaintiff responded: "There was no way I could see it. It looked as if it was a very safe place and a flat place to stand." Plaintiff had "walked by and looked and was standing there, and everything seemed perfectly safe to [her]." Asked about the differentiation of color between blacktop and concrete, plaintiff acknowledged a distinction, "but [insisted that] if you go back to where there is a shadow, to me, that

night it did not stand out as it does in contrast in this picture. *And for the color, that's what you're talking about, the color.*" (Emphasis supplied.)

Defendants' Exhibit B consists of two color photographs showing the catch basin. Exhibit C shows that the lip is neither flat nor gradually sloping but declines steeply into the drainage area. While the concrete lip is lighter than the parking area of black asphalt, that lip has become darkened and dingy with time.

In reply to defendants' motions, plaintiff Silver submitted the affidavit of Seymour W. Liebmann, a licensed professional engineer, who deposed that the catch basin was defectively designed and constructed. Specifically, the interface between the "To Go" parking space and the adjacent storm drain was unsafe because the level parking lot asphalt "drops precipitously into the catch basi[n] at a very sharp and unsafe angle." Engineer Liebmann further deposed that the space immediately adjacent to the catch basin "should not have been used as a parking space . . ." because of the sharp drop-off at the edge of the pavement; because a rough joint exists, due to this sudden change in elevation, and because there were no safety markings.

The trial court denied defendants' motions for summary judgment, but certified its order for immediate review. The joint application of all defendants for interlocutory review of that denial was granted, and in *Freyer v. Silver*, 227 Ga. App. 253 (488 SE2d 728) (1997), a majority of this Court reversed, concluding the catch basin into which plaintiff fell was a static open and obvious condition of which the owner had no duty to warn her. The Supreme Court of Georgia granted plaintiff's petition for certiorari, vacated this Court's prior judgment, and remanded the case to this Court for reconsideration in light of *Robinson v. Kroger Co.*, 268 Ga. 735 (493 SE2d 403) (1997). *Held*:

1. Pursuant to the direction of the Supreme Court of Georgia, our prior judgment, reported at 227 Ga. App. 253, supra, is vacated.

2. Contrary to the dissent's unsupported assertion, this case does not involve the so-called first prong of the test for liability established by *Alterman Foods v. Ligon*, 246 Ga. 620, 623 (272 SE2d 327) (1980). It is a defendant's actual or constructive knowledge of the alleged hazard which constitutes the first prong. *Sharfuddin v. Drug Emporium*, 230 Ga. App. 679 (1) (498 SE2d 748) (whole court). See also *Robinson v. Kroger Co.*, 268 Ga. 735 (1), 736, supra. " 'The liability of a proprietor under (OCGA § 51-3-1) which results from failure to keep the premises [and approaches] safe always depends on notice of the danger except where notice is presumed, as in cases of defective construction.' *Veterans Organization v. Potter*, 111 Ga. App. 201, 205 (141 SE2d 230) (1965)." *Robinson v. Western Intl. Hotels Co.*, 170

Ga. App. 812, 813 (1), 814 (318 SE2d 235). Moreover, the owner/occupier's duty to exercise ordinary care "includes inspecting the premises to discover possible dangerous conditions of which the owner/occupier does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises. [Cits.]" *Robinson v. Kroger Co.,* 268 Ga. 735 (1), 740, supra.

The case sub judice involves allegedly defective construction. Knowledge that the designated "To Go" parking space closely adjoins the deceptively steep catch basin is therefore presumed on the part of the defendant owners and the defendant occupier, when considering their motions for summary judgment. Consequently, the applicable inquiry is directed to the second prong: whether the record shows plainly, palpably and without dispute that plaintiff had knowledge of the hazard equal or superior to that of defendants or, would have had equal or superior knowledge had the plaintiff exercised ordinary care for personal safety. Each defendant retains "the evidentiary burden as to the issue of the plaintiff's negligence after it has been established or assumed for purposes of a motion for summary judgment that the defendant was negligent. . . ." *Robinson v. Kroger Co.,* 268 Ga. 735, 743 (2), 746 (2) (b), 748, supra.

3. Relying on *MARTA v. Fife,* 220 Ga. App. 298 (469 SE2d 420), defendants contend the trial court erred in denying summary judgment, arguing the "catch basin in question is 'transparently obvious.' There is a [purportedly] clear contrast between the curbing and the blacktop. The hole and slope are wide and obvious. Had Ms. Silver only looked down, she would have seen the danger and avoided it. However, the record shows she did not look."

Recognizing the very close factual similarity between *MARTA v. Fife,* 220 Ga. App. 298, supra, and the case sub judice, we are nevertheless bound to follow the applicable and controlling authority of *Robinson v. Kroger Co.,* 268 Ga. 735 (1), 743, supra, where "the Supreme Court of Georgia 'disapprove(d) of the appellate decisions which hold as a matter of law that an invitee's failure to see before falling the hazard which caused the fall constitutes a failure to exercise ordinary care.' Id. That Court held 'an invitee's failure to exercise ordinary care is not established as a matter of law by the invitee's admission that [s]he did not look at the site on which [s]he placed [her] foot or that [s]he could have seen the hazard had [s]he visually examined the [ground] before taking the step which led to [her] downfall. Rather, the issue is whether, taking into account all the circumstances existing at the time and place of the fall, the invitee exercised the prudence the ordinarily careful person would use in a like situation.' Id. at 748 [(2) (b)]." *Sadtler v. Winn-Dixie Stores,* 230 Ga. App. 731, 732-733 (498 SE2d 101) (1998), cert. denied.

In the case sub judice, the photographic evidence indicates the color contrast between the level black pavement and the precipitously steeply sloping concrete that has become dingy and weathered is not so stark as defendants insist. Plaintiff pointed this out in her deposition. Moreover, such color contrast as exists reveals nothing about the sudden and deceptive declivity of the catch basin. Whether the manhole cover embedded in the concrete over the catch basin should have alerted plaintiff remains a question for the jury to determine, for it is the plaintiff's knowledge of the specific hazard precipitating a slip and fall which is determinative, not merely her knowledge of the generally prevailing hazardous conditions or of hazardous conditions which plaintiff observes and avoids. *Gourley v. Food Concepts*, 229 Ga. App. 180 (493 SE2d 587) (whole court). "The 'plain view' doctrine is the equivalent of the 'constructive knowledge' aspect of voluntary negligence on the part of the plaintiff." *Robinson v. Kroger Co.*, 268 Ga. 735 (1), 743, supra. Reasonable minds can differ as to whether plaintiff should have seen and avoided the hazard presented by the sharp, unmarked drop-off to the catch basin. We hold the case sub judice falls within the general rule, as recently pronounced by the Supreme Court of Georgia: " '[I]ssues of negligence, contributory negligence and lack of ordinary care for one's own safety are not susceptible of summary adjudication . . . but should be resolved by trial in the ordinary manner. (Cit.)' " *Robinson v. Kroger Co.*, 735 (1), 739, supra. The trial court correctly determined that genuine issues of material fact remain for jury resolution.

*Judgment affirmed. Johnson, P. J., Smith, Ruffin and Eldridge, JJ., concur. Andrews, C. J., and Beasley, J., dissent.*

ANDREWS, Chief Judge, dissenting.

I respectfully dissent because I believe that the catch basin into which Silver fell was a static open and obvious condition of which the owner had no duty to warn her.

This case deals with the first prong of *Alterman Foods v. Ligon*, 246 Ga. 620, 623 (272 SE2d 327) (1980), the owner's duty to exercise ordinary care to protect the invitee from unreasonable risks of harm of which the owner has superior knowledge, as discussed in *Robinson v. Kroger Co.*, 268 Ga. 735, 736-740 (493 SE2d 403) (1997), and is therefore not affected by the changes in summary judgment evidentiary burdens made in *Robinson*, supra at 748, regarding the second prong of *Alterman Foods*, the plaintiff's lack of knowledge of the hazard or distraction by the defendant.

As acknowledged by the majority, prior to purchasing the shopping center, Freyer had retained architect Coursey and the two walked over the property so Coursey could evaluate it from a structural standpoint. No problems in design, construction or mainte-

nance were noted. As reflected by the affidavit of Liebmann, Silver's expert engineer, the claimed defects are of the type which required architectural or engineering expertise to comprehend, which neither Freyer nor the other defendants possessed. Liebmann opined that the catch basin was defectively designed and constructed because the interface between the parking space and the storm drain was too steep an angle. Of course, none of the defendants had anything to do with the design and construction of the catch basin. Additionally, Liebmann stated that the danger "would be obvious . . . to any user of the parking lot who could plainly see and become aware of the sharp drop." In his opinion, Silver did not see the danger "because of the shading caused by her car which prevented her from seeing and appreciating the sharp drop off. . . ." The affidavit, however, does not address the significance of the manhole cover in relation to the culvert and drain opening.

In addition to the facts set out in the majority, Silver acknowledged that she was familiar with catch basins and that one was located near her residence.

Asked what caused her to fall, Silver testified as follows: "I must have just shifted my weight or moved my foot a little, and all of a sudden I went sliding down with both feet into this area. . . ." "There was some shadow cast from the sun in the west. . . . I know that there was a shadow here. . . . It was like early dusk. Q. Did you have any difficulty seeing where you were going? A. No. . . ." "Q. Do you believe the light conditions had anything to do with your fall? A. I, I really don't know. Q. Do you know why you fell? A. Because there was a hole there. There was an area that was slanting down that I did not see, and I couldn't see. . . . It looked straight. . . . There was no way I could see it. It looked as if it was a very safe place and a flat place to stand. Q. Before the fall had you looked at this area? A. I walked by and looked and was standing there, and everything seemed perfectly safe to me. . . ." Asked about the differentiation of color between blacktop and concrete, Silver acknowledged a distinction, "but I believe if you go back to where there is a shadow, to me, that night it did not stand out as it does in contrast in this picture. . . ." "I don't consider when I fell late evening, but I do feel that there was a shadow here which made it look different than it does in this picture."

The only possible reason Silver gave for not being able to see the sloping hole in the catch basin, which was made of concrete lighter than the parking area of black asphalt, was that the sun was setting and her car was parked so that a shadow was cast on that sloping concrete portion. The photos submitted by Silver of the spot where she fell, with her car parked in approximately the same location as the night she fell, clearly indicate, however, that even when the

opening of the catch basin is shadowed, the manhole cover on the catch basin, which Silver was facing before her fall, is visible, indicating the location of a culvert for draining water.

(a) First, it must be emphasized that the catch basin into which Silver fell was *not* a "defect" in the property. It was a planned feature incorporated into the design of the project by the original developer in order to divert rainwater from the premises. Upon purchasing the property, the owner, Domus, had exercised the ordinary care required of an owner and had it inspected and been advised of no problems or "defects" in it. The catch basin cannot, therefore, be said to create an "unreasonable risk of harm" from which the owner/occupier must use ordinary care to protect invitees based on its superior knowledge as discussed in *Robinson*, supra at 740. The catch basin's primary purpose was to avoid the accumulation of rainwater on the asphalt in an area where vehicles were invited to park, leaving oily substances which vehicles leave in such areas, and which invitees were invited to traverse. Had there not been a catch basin where one needed to be in such a situation, the owner/occupier risked exposure to claims based on standing water and its attendant hazards, including water mixing with the oily substances in the parking area. See, e.g., *Hardeman v. Spires*, 232 Ga. App. 694 (503 SE2d 588) (1998) (fall on wet tile on porch); *Cleveland v. Snowdrop Properties*, 232 Ga. App. 447 (501 SE2d 546) (1998) (fall on wet leaves on sidewalk); *Dumas v. Tripps of North Carolina*, 229 Ga. App. 814 (495 SE2d 129) (1997) (restaurant patron's fall on ice while getting out of car in parking lot); *Arwood v. Tzen*, 224 Ga. App. 722 (481 SE2d 874) (1997) and *Van Dyke v. Emro Marketing Co.*, 211 Ga. App. 744 (440 SE2d 469) (1994) (both involving customers falling due to mixed oil products and water in convenience store parking lots).

(b) Further, there can be no question that the catch basin, whether defective[1] or not, was an open and obvious static condition and the only possible reason given by Silver as to why she could not see the hole in the catch basin was a shadow created by her own car.[2] This case is factually very similar to and controlled by *MARTA v. Fife*, 220 Ga. App. 298 (469 SE2d 420) (1996) (whole court). There, as here, a drainage culvert was involved. Fife stepped off of a curb formed by the top of the catch basin and into the culvert which she did not see because she was looking at the door of her sister's car.

---

[1] As stated above, Liebmann's only claim of defect was the improper slope in the catch basin *as constructed*, for which Domus had no responsibility and of which, as far as the record reflects, neither Domus and its partners nor Po Folks was aware.

[2] Silver does not say that she did not see the catch basin, only that she did not notice the sharp slant of the intake. Therefore, she chose to stand beside what she knew to be a water intake.

Here, as in *Fife*, "[s]ince the drainage depression was open and obvious, [Po Folks, Freyer and Uberto were] under no duty to warn. An owner or occupier of land has a duty of exercising ordinary care to keep the premises and approaches safe for invitees. OCGA § 51-3-1. The basis of the owner's liability is a superior knowledge of the condition that subjected the invitee to an unreasonable risk of harm. [Cit.] The hazard in this case is a 'static' condition which is not dangerous unless someone fails to observe it and steps into it. [Cit.] In cases involving static conditions, 'if the invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does and then by voluntarily acting in view of his knowledge, assumes the risks and dangers incident to the known condition.' (Citation and punctuation omitted.) *Rose v. Kennesaw House*, 203 Ga. App. 648, 649 (417 SE2d 379) (1992). Also, we have held that where there is nothing to obstruct or interfere with the invitee's ability to see the static defect, the owner is justified in assuming that the visitor will see it and realize the risks involved. *Crenshaw v. Hogan*, 203 Ga. App. 104, 105 (416 SE2d 147) (1992)." *Fife*, supra at 300 (2). See also *Tollman v. Zamani*, 224 Ga. App. 518 (481 SE2d 232) (1997) (concrete block, approximately ten inches high and thirty inches wide with four metal bolts protruding from the top approximately six inches, held to be open and obvious static condition in parking lot).

Certainly as common, if not more so, are catch basins of the type involved here, as acknowledged by Silver. See *Fife*, supra; *Sullenberger v. Grand Union Co.*, 201 Ga. App. 194 (410 SE2d 381) (1991) (use of concrete dividers or bumpers in a parking lot does not constitute negligence).

In my opinion, both Po Folks and the owners of the shopping center were entitled to summary judgment. See *Poythress v. Savannah Airport Comm.*, 229 Ga. App. 303, 306 (494 SE2d 76) (1997) (tripping on open and obvious handicapped ramp); *Anderson v. Turton Dev.*, 225 Ga. App. 270, 273 (2) (483 SE2d 597) (1997) (operator of inn entitled to summary judgment although owner, which designed and constructed allegedly defective handicapped ramp, was not). Here, there is no allegation that the owners, Domus and its partners, had anything to do with the design or construction of the catch basin, nor is there any evidence of any failure to maintain the basin or to provide adequate ingress and egress to the restaurant.

I am authorized to state that Judge Beasley joins in this dissent.

DECIDED AUGUST 19, 1998 —
RECONSIDERATION DENIED SEPTEMBER 8, 1998 — 

*Bach, Hulsey & Carver, Robert J. Hulsey, Dermer & Black, Stephen F. Dermer,* for appellants.

*Warshauer & Woodruff, Michael J. Warshauer, Michael R. Goldberg,* for appellee.

